for trailing this matter for me. May it please the Court, my name is Linda Bell. I am a Federal Public, Assistant Federal Public Defender in the District of Nevada, and I represent Mark Baeta. I would like to reserve two minutes for rebuttal, and I will keep my eye on the clock. This case is about Mr. Baeta's attorney grossly mischaracterizing the sentence Mr. Baeta was likely to receive if he entered into a plea negotiation, which resulted in Mr. Baeta pleading guilty and receiving a sentence of life in prison. Under Strickland v. Washington and Hill v. Lockhart, Mr. Baeta has to show that his counsel's performance was deficient, and because of that deficiency, that he would not have pled guilty but gone to trial. Here the deficient performance is clear from the record. Mr. Baeta's counsel, without performing any investigation about Mr. Baeta's criminal background, suggested that if Mr. Baeta pled guilty, he would receive a sentence of five years. After the pre-sentence memorandum arrived, he wrote a letter to Mr. Baeta on August 23rd of 1996 that said, and this is after Mr. Baeta had pled, my hope for you to receive a five-year sentence was based on erroneous information. I was unaware of your prior criminal history and series of convictions for related charges. Unfortunately, I believe that Judge Adams will interpret your criminal history as an aggravating circumstance. Did Baeta tell him what his prior history was? Your Honor, it's very unclear from the record what Mr. Baeta actually told him. During the investigation, however, even if Mr. Baeta did not tell him, his counsel had an independent duty to investigate the criminal history. Well, you can say that, but suppose he says to his client, look, do you have any priors? He definitely knew that Mr. I'm sorry. Suppose he says to his client, do you have any priors? And the client says, yep, I have but only two. I have only two priors, and that's A and B. And counsel advises on the basis of that. Is that ineffective? I believe so, Your Honor. Particularly, Mr. Merkin was an experienced public defender, and anybody whose practice as a public defender knows that clients are notoriously unreliable for providing an accurate criminal history for a number of reasons. Some of it may just be that things seem insignificant to them that are, in fact, tremendously important to us as lawyers. Well, you know, I guess the question I have is, so what? He knew what his prior history was, so that, and when he got to the plea colloquy, he was told what he could get, and he said he understood it. So I guess I don't see how, in the Strickland sense, there was any prejudice as a result of his knowingly misrepresenting his own criminal record to his own lawyer. Well, Your Honor, it's not clear that he did misrepresent his record. He says, like I said, it's very difficult to figure out exactly what he told his counsel. However, it is clear from the letter and clear from the guilty plea agreement that counsel knew that he had two prior felony convictions, which I believe is an accurate representation of his criminal record, but counsel was not aware of a number of misdemeanor convictions that included sex-type offenses such as indecent exposure. And that apparently is what gave rise to the letter. However, Mr. Bader relied upon, when he pled guilty, his counsel telling him that he was going to receive five years. That five-year estimate is troubling, I believe, in and of itself, because Mr. Bader was charged with sexual assault on a minor, and the convict charged was he, being a 38-year-old man, licking the vagina of a 6-year-old girl. It is difficult for me to imagine a public defender or any defense lawyer saying, I think that we can get you a five-year sentence, whether Mr. Bader had any criminal history or not. But in this case, that's what his lawyer did. He said, I think we can get you five years. And then, lo and behold, when he, after he failed to investigate Mr. Bader's record and had him plead guilty to something where he was exposed to a life sentence. And that's exactly what Mr. Bader got. Mr. Bader was relying on his counsel telling him he was going to get five years when he pled. Would he be entitled to rely on his counsel if the judge tells him something different in the plea colloquy? Because he believed that that's what he needed to do to get the five years his lawyer had told him he was going to get. And I think that's evidence in the rough nature of the plea colloquy. The first thing the judge says is, you know, did you do this? And he said, no, I didn't. So then they have to take a break. He has to talk to the lawyer. He says during that time, the lawyer tells him, look, you know, it's your neck. You can do five years or you can do, you can get out of prison when you're 43 or you can get out of prison when you're 58. It's up to you. And so he comes back and he says what the judge wants him to hear so that they can get through the rest of the plea canvas. The lawyer says that he never has promised anybody such a thing. Isn't that right? He said he's never guaranteed a sentence. Never guaranteed a sentence. And the judge found that Beda is just plain a liar. So he didn't take, put much credence in anything Beda had to tell him. Right? Well, that's true, Your Honor. However, the letter that that defense counsel sent to Mr. Beda clearly states that he did tell him that his hope was for a five year sentence. Additionally. Yeah, he did. He said that he didn't promise him that at all. And Beda knew that he wasn't being promised a five year sentence when Judge Froder said he agreed that the judge could just go off and sentence him to life. Well, his lawyer told them, though, that he was he hoped for a five year sentence and in fact was concerned enough about whatever it was that he said that when he found out there was some additional criminal history, he sent him a letter saying, oh, you know, maybe we should ask for 10 years. What Mr. Beda got was a life sentence. That wasn't even on Mr. Beda's radar of what he was going to receive for a sentence based on the representations made to him by his counsel. He trusted his lawyer and what his lawyer said was going to happen if he pled guilty. There would be no reason for Mr. Beda to accept this negotiation if he believed that there was a likely possibility that he would receive a life sentence. He was charged with two other counts, neither of which carried life sentences, and one possibly would have merged. He would have had no incentive to accept this negotiation if he thought that that was a realistic possibility. But he relied on his lawyer telling him that he was going to receive five years. And just because he gave the right answer at the plea hearing is not conclusive. This Court has found that in Christie. So Mr. Beda relied on the representations of his lawyer to his detriment, but for the reason that he would receive five years, he would have challenged the evidence and gone to trial. I would like to reserve the remaining time for rebuttal. It was Christie you just referred to? I'm sorry? It was Christie, the case you just referred to? Christie. Christie, yes. I see it in your brief. Good morning. I'm Eric Levin, Deputy Attorney General, on behalf of the respondents. First, I'd like to be clear about what the certified issue here is, and it's not whether or not defense counsel grossly mischaracterized the sentence. The issue is whether or not defense counsel misinformed Beda of the potential length of his sentence. And Mr. Beda was informed numerous times in the course of the proceedings what the potential length of the sentence was. What happened in this case, Mr. Beda was originally charged with a single count of sexual assault on a minor under the age of 14 and two counts of lewdness with a minor under the age of 14. He pled to a sexual assault without the enhancement that it was on a minor, and by doing so, he saved himself a potential 14 years of the minimum term of the sentence until he was eligible for parole. So he did receive a substantial benefit from his bargain. What's his, under the sentence he did receive, when's he eligible for parole? I know that checking the Department of Corrections website, it's currently listed as coming up for parole in 2009. But the judgment of conviction doesn't specify, but it would have been 10 years, the minimum eligibility. So what he got was a difference in the 4 years in the minimum before he could be considered for parole. What he got was actually a difference of 14 years, potentially 14 years had the two lewdness counts been imposed with minimum consecutive sentences, or he saved a potential 14 years. He signed a plea memorandum, which spelled out that he was eligible for parole, the potential length that he could be facing. In that plea memorandum, in response to a question I've asked earlier whether or not the defendant had ever told his counsel what his record was, it wasn't unclear, it was very clear. In the plea memorandum, there was a specific portion where he says, my prior criminal history consists of two convictions for theft-related offenses. And if that turned out to be incorrect, the State was permitted to withdraw from the plea agreement, which they still, when it turned out to be incorrect, the State still gave him the benefit of the bargain, so there was no prejudice there. At Mr. Bates, so that's the first time they've seen you. Kennedy, I suppose if he's trying to show prejudice, he's kind of made his case by moving to withdraw his plea before sentence. Isn't the prejudice, well, I would not have pleaded if I hadn't been misled? Well, there was no misleading. I think what you're seeing there, when he did that after the pre-sentence investigation report came out, is simply buyer's remorse. He didn't like what the report said. He knew at that point the jig was up because he got caught in his lies, and now he's trying to backtrack and get out of it. So he knows the potential length of the sentence from his plea memorandum. At the arraignment, his counsel set it forth again, where he put it on the record that he was looking at a potential life sentence. His counsel, you know, clarified again later in the record, that's at Excerpt of Record 51, when the court asked the defendant, you know, what you're faced with. And he said 20 years, and his counsel said, he means 20 to life, Your Honor. And then again, the court backtracked because they wanted to make very sure that this defendant understood what he was facing, and the court told him again, you know, 20 to life or 5 to 20. There's two alternatives there. So he was told four times on the record or in the plea agreement what the potential sentence was that he was facing. The letter from the one that was referred to where Mr. Merkin talks about, it was a hope based on what the defendant told him was his entire criminal history. He had a hope that he could argue for the lower 5-year term, and when it turns out that the information that his client gave him was a lie, then he said, well, then he tried to, you know, minimize the damage. And in fact, he was able to get a 10-year sentence. And so, you know, prior to eligibility of parole, with respect to the voluntariness of the plea, and I'm sure this Court knows in Blackledge v. Allison, the United States Supreme Court talked about the statements of the defendant, the findings of the court, and the presumption of verity that those are afforded. And it also then talked about that this was a very formidable barrier for a defendant to overcome. This is a case where you've got a defendant saying, well, my attorney promised me something. Well, I'd almost be willing to say as a matter of law, that's with nothing further, that's insufficient to overcome that formidable barrier, because every person in prison who didn't represent himself at pro se, had to go through a trial and say, all they would have to do is say, well, my attorney promised me something. And if that's all it takes, you don't have a formidable barrier, you have no barrier at all. This case is even worse than that typical case, because here we have a defendant who's left a long trail of deceit and lies to investigators, to his attorney, to the court. So you have something even less than that, and it's far short of what's required, I think, to overturn a guilty plea. I understand that argument. Just sort of as a separate matter, would you say that it is below the standard of professional performance not to call for a rap sheet when you represent a defendant? Well, I think no. I think when you ask your client, who's the one who's got a pretty good idea, and he mischaracterizes his history as grossly as this defendant did, it's not ineffective. Strickland tells us, as well as four other circuit court cases that I cited in my brief, that the attorney's, you know, permitted to rely on representations of his client, and that's going to determine what investigation he needs to do. So when something's mischaracterized this poorly by the guy's client, I don't think he was unreasonable for not then further going and trying to get a copy of a rap sheet. This is what his client told him. Well, I'm sorry. I won't argue with him. I just seems that seems very odd that you wouldn't get a rap sheet. But what do we do with the are we there's an opinion of the Supreme Court of Nevada that says that the reference is a post-conviction evidentiary hearing. The trial counsel testified he never guaranteed any sentence to the defendant any sentence to any defendant that he represented, and the appellant testified that he pleaded guilty in reliance on his attorney's promise he would be sentenced to five years. The trial court found that the appellant's testimony was not credible. Is that a finding that we're bound by? Yes. Under EDPA, you're entitled to, well, you're required to give the deference to those factual findings of the State courts. With respect to the credibility findings, I think it's even stronger. Marshall B. Longberger says that that's within the province of the State court that had the opportunity to observe the testimony of the witnesses and that there's no place for a Federal court in determining the credibility of the witnesses. So in a sense, does the case end there? In my view, it does. So just to be clear, I think I'm just about done with my time, but the defendant's claims were not credible. They're belied by the record. He failed to meet his burden on the ineffective assistance claim, failed to show that the Nevada Supreme Court misapplied clearly established Federal law, and he failed to show that there was any unreasonable determination in lieu of the facts that were found in Johnson v. Baldwin. And I'd ask that you affirm the denial of his post-conviction petition. Thank you. First, I'd like to point out there's an independent duty for lawyers to investigate. This Court has found in Johnson v. Baldwin that prejudice from failing to investigate is not avoided by the fact that the client misinformed his lawyer. And it's not clear that that's exactly what happened, although the record is quite confusing on that. He did at least tell his lawyer he had two felonies. There were other arrests and more minor convictions that his lawyer obviously didn't know about. Additionally, with respect to the Court's question regarding the credibility finding, even if the finding that Mr. Beda is not credible is deferred to, that doesn't change in any way the fact that the lawyer is the one who sent the letter saying, gee, I told you you were going to get five years, but it doesn't look like it because I didn't bother to investigate your background. So the lawyer's letter on its own gives the foundation for this claim. Now, credibility was that he relied on that in pleading guilty, that he wouldn't have pleaded guilty if that was the thing that he relied on, and that was found not credible. Well, I think that that's relied by the record. Mr. Beda, that's the one thing he's consistently said throughout the course of this litigation. When he got the letter from his lawyer, he immediately filed a motion to withdraw his claim. He said, I was going to get five years. He has every step of the way. That's one thing that's very... Right. And that's what triggered the hearing, right? Isn't that what triggered the hearing? That's correct. But the lawyer at the hearing didn't say anything consistent with that other than, I've not guaranteed a sentence. But we have no other way of knowing of how Mr. Beda took the advice of his counsel than from hearing it from him. I mean, the lawyer's saying, I see I'm out of time. You can finish the sentence. If the lawyer's saying, you know, this is what you're going to get, may have impacted Mr. Beda as a promise that he relied upon. Right. Thank you. The case just argued is submitted for decision.
judges: Schroeder, Canby, Fernandez